## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

REGINALD LANGSTON LUSTER,

      Petitioner,

v.                                      Case No. 4:19-cv-541-MW/MJF

FLORIDA DEPARTMENT OF
CORRECTIONS SECRETARY,

      Respondent.

_____/

## REPORT AND RECOMMENDATION

Petitioner Reginald Langston Luster ("Luster"), proceeding with counsel, has filed an amended petition for writ of habeas corpus under 28 U.S.C. § 2254 along with two appendices containing portions of the state court record. (Doc. 3, 4, 10). Respondent ("the State") answered, providing portions of the state court record in two exhibits. (Doc. 19). Luster replied. (Doc. 23). The undersigned concludes that no evidentiary hearing is required for the disposition of this matter, and that Luster is not entitled to habeas relief.[1]

---

[1] The District Court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b).

## I. BACKGROUND AND PROCEDURAL HISTORY [2]

Luster was charged by amended information with the March 15, 2012, attempted first-degree murder of Gabriella J. Stroude, described as his "on-again-off-again" girlfriend. (Doc. 4-1 at 23). His first trial, held on January 28-30, 2014, at which Luster testified, resulted in a mistrial due to a hung jury. (Doc. 4-4 at 1- 696). A second trial, at which Luster did not testify, was held on July 15-18, 2014. (Doc. 4-5 at 1).

### A.    Jury Trial

Gabriella Stroude was a student at Florida State University in 2012 and lived in a dormitory apartment, which comprised four separate bedrooms and bathrooms, a common area, and kitchen. She met Luster and began dating him in the fall of 2011. At the time of the alleged offense, their relationship was "rocky." On March 15, 2012, she met with Luster at Starbucks and they went to her dorm. One of her roommates, Kathryn Palmer, was there at the time of the incident. When Stroude came out of her bathroom, Luster was in her bedroom. She said he began asking her questions about a phone number he saw on her cell phone. She told him it was her

---

[2] The summary of evidence is drawn from the pertinent testimony presented at trial. (Docs. 3, 4, 19-1, 19-2). It is related in detail due to the nature of the claims in this case. Citations to the state court record and the parties' pleadings refer to the document numbers and page numbers assigned by the court's electronic filing system.

cousin, but the number actually belonged to Michael Grant, a former boyfriend, who also was living in Tallahassee. Stroude testified Luster knew about Grant and that it was a source of tension in the relationship. She testified that she saw Grant for the first time in months at the library on March 14, the day before the incident. Also on that date, Stroude learned that Luster sent a Facebook message in February to Grant from her account, in her name, telling Grant that she did not want to see him again.

Stroude testified that Luster then threw her cell phone at the window, screaming at her about cheating, and then threw her against the closet door. She fell and her nose began to bleed. She said Luster was remorseful and left to go to class sometime around 2 p.m. Her roommate found her crying and, when Stroude could not find her cell phone, she and Palmer looked for it by calling it from Palmer's phone, but they could not find it.

A short time later, Luster returned to Stroude's dorm room. She asked about her phone and he went into the bathroom and came out with it, although she said she had looked there without finding it. The phone showed several text messages, which Stroude said she did not send, that were sent within a half hour before Luster produced her phone. The messages were to Grant. It also showed several text messages and a call from him that she said she did not receive. She testified that, at

some point, she called Grant to tell him that she was not the one who sent the text messages, and that Luster knew who she was calling.[3]

Stroude explained that on the night before the incident, she was told by an acquaintance that Grant was in the library. Stroude called the acquaintance asking for Grant's cell phone number, which was sent to her in a text. Jennifer Roeder, Florida Department of Law Enforcement digital evidence technician, later testified that Stroude's cell phone records showed the call to Stroude's acquaintance and a text message from that acquaintance on the night before the incident that contained Grant's telephone number. Roeder also testified that on the day of the incident, at 2:02 p.m., a Google search was made on Stroude's cell phone for information about the telephone number texted to Stroude. Stroude said that she did not perform that Google search.

Stroude testified that Luster asked for a glass of water and appeared to faint, hitting his head on the bed frame. She denied pushing him. His head was bleeding, so she put a Band-Aid on it and asked him to leave. She testified that she threatened

---

[3] Michael Grant testified that in February 2012, he received a Facebook message purporting to be from Stroude saying that she did not want to have any more contact with him. The message did not sound like her and they did not really communicate over Facebook. He received a text message purporting to be from Stroude on March 15, 2012, at 2:25 p.m. saying it was nice seeing him the day before. He received another text message at 2:25 p.m. saying, "In class. Bored." He texted her cell phone back asking if she had ignored his call to text him. Grant confirmed that he also called Stroude's cell phone on March 15, 2012. (Doc. 4-5 at 348-55).

to call the police, and her phone showed a 911 call, but the call was terminated before connecting. She could not remember if he asked her to call 911.

Stroude again asked Luster to leave, but he told her to read something on his cell phone that he wrote a long time ago "but he wanted [her] to read it now because he figured that [they] would break up some day." (Doc. 4-5 at 73). She testified that as she was reading the note, Luster stabbed her in the back and struck her head. After Stroude fell to the floor, Luster stabbed her Stroude's chest and arms. Luster told Stroude that he wanted her to die.

Luster also stabbed himself and said that if he could not have Stroude, no one else could, and they would die together. Luster held the knife blade on the closet door and leaned into it. At this point, the dormitory resident assistant, Keith Holt, came to the door and called for help. When Stroude came into the common area of the dorm apartment, Luster came out of her room with a piece of her clothing wrapped around his hands. Luster dropped the knife and then fell down. Luster stated that Stroude had stabbed him and requested that someone call his father.

Stroude's roommate, Kathryn Palmer, testified that she was in her room on March 15, 2012, when she heard hysterical crying. She left her room to check on the situation and found Luster leaving Stroude's room. He said Stroude was fine and had just hit her head. Luster left and when Stroude came out of her room, she was visibly upset, shaking, and crying. About ten minutes after Palmer returned to her

room, Stroude came to her door and asked her to call her cell phone because Stroude could not find it. Stroude told her she thought Luster had taken it. They could not find the phone and Palmer returned to the kitchen to wash dishes, including a large knife which she left on the side of the sink to dry. She identified the broken knife in evidence as that knife.

Palmer returned to her room to watch a movie on her computer. She heard people come into the apartment and heard a commotion, recognizing Stroude's voice saying she was calling the police. Shortly thereafter, Palmer heard a female emit a "blood curdling kind of scream." (Doc. 4-5 at 232). Palmer ran across the apartment hall and opened Stroude's door and saw Luster on top of Stroude, straddling her and "pounding into her." (Doc. 4-5 at 234). Because Luster's back was to her, she could not see if he had anything in his hand, but his arm was moving up and down rapidly. Palmer said Stroude was defenseless and blood was squirting on the wall from her upper region. Palmer ran to get help and summoned the dorm Resident Assistant, Keith Holt.

Luther Pararo, M.D., an emergency department physician, treated Stroude for her wounds on March 15, 2012. She had multiple stab wounds to her chest and back and some laceration sharp force injuries. She had laceration wounds on her ear and scalp. (Doc. 4-5 at 463-65). One stab wound to the back appeared to be deep and her

clavicle had a chip fracture, which could have been caused by the weapon or by being slammed to the ground. (Doc. 4-5 at 471-72).

Jonathan Wainwright, Florida State University police officer, testified that on the day of the incident he responded to Ragans Hall and found Stroude covered in blood. The EMS personnel were treating her when he arrived and, when he leaned down to speak to her, she told him Luster tried to kill her. Although there was a lot of blood throughout the apartment, Wainwright collected blood swabs from only four locations: from the back wall of the bedroom; from next to where the knife blade was found; from the chair where Stroude was sitting in the common area; and from the area where Luster was lying on the floor. The parties stipulated that there were no fingerprints of value found on the knife handle. Steven Wisecup, former evidence technician for the Florida State University Police Department, testified to taking swabs of three blood drops found on the closet door of Stroude's bedroom. The door was not taken into evidence on the day of the incident, but was taken from the room on March 29, 2012, by university police after the crime scene had been cleaned and reopened.

Suzanne Livingston, senior crime laboratory analyst with the Florida Department of Law Enforcement, testified that DNA in blood found on Stroude's cell phone matched Luster's DNA. DNA in the blood from the bedroom wall matched Stroude's DNA. DNA in the blood from the floor by the counter matched

Luster's DNA. DNA in three blood swabs taken from the closet door matched Luster. DNA in blood samples taken from a polka-dot shirt matched Stroude. DNA in blood from the tip and middle of the knife blade was mixed DNA of Stroude and Luster. DNA in blood from the middle of the blade was mixed, with the major donor being Luster and the minor donor being Stroude. DNA in blood from the area of the knife where the handle would be was mixed, with the major donor being Luster and no conclusion as to the minor donor. DNA from a swab of the knife handle which had broken from the blade was mixed, and included both Luster and Stroude. DNA in blood on yellow sweatpants found near the dropped knife matched Luster.

After the State rested its case, the defense presented Joseph Walsh, of Associated Cleaning and Restoration company, whose company did biohazard cleaning of the apartment where the incident occurred. He testified that his team attempted to identify and clean any areas where blood was found, including on the closet door, but could have missed pinpoint-size blood spots on the closet door. (Doc. 4-5 at 575).

Michael Abate, a resident of Ragans Hall on the date of the incident, testified that his room was on the same floor as Stroude's. He heard Kathryn Palmer screaming in the hall and went to investigate. He entered Stroude's apartment and saw her enter the common area holding her abdomen and then sit in a chair. He said Keith Holt came to the door after him. He testified that Luster then came into the

area and said "she stabbed me" and then leaned across Stroude's lap, saying "why did you do this to me, baby?" He also heard Luster say "call my dad, I think I'm going to die." (Doc. 4-5 at 592). Abate said he then went downstairs to let in first responders and took them to the room. He was never questioned by law enforcement and did not know why Keith Holt did not report him being in the room.

Forensic pathologist Jesse Giles testified that he was retained to render an opinion and that he reviewed the police report, the EMS report, the ER records, laboratory reports, hand surgery reports, and some other information. He also reviewed past medical records for Stroude and a statement she had given, as well as sworn statements of another forensic pathologist, Dr. Lisa Flannagan, who had opined that Luster's chest injuries were self-inflicted. Dr. Giles opined that the cuts on Luster's chest and his hands were not self-inflicted because they did not match any pattern he had ever seen for self-inflicted wounds. He also opined that the cuts on Luster's hands were defensive. He noted that Stroude had a cut or tear on one of her fingers that, although not typical, could be considered defensive. Dr. Giles testified that after Luster's hands were cut, he could not hold anything tightly to fight back with the blade. He testified that the stab wounds to Stroude's back were not likely self-inflicted, and would have been done before Luster's hand wounds.

Michael Knox, a forensic consultant who does crime scene and traffic accident reconstruction, opined that the evidence that was collected was "ambiguous" and

that other evidence—more blood stain evidence from different locations—should have been collected to present a full picture. He opined that lack of a large amount of blood near the closet door does not support the testimony that Luster used the door to push the knife into his own chest. He opined that "you really can't eliminate either event and say it happened this way to the exclusion of any other possibility." (Doc. 4-5 at 656-800). Knox agreed on cross-examination that scratches on the closet door were consistent with Stroude's testimony that Luster pressed the knife blade there to inflict injuries to his chest. He agreed that her blood on the wall was consistent with her testimony that she was stabbed in that area. He agreed that Luster's blood droplet found near the tip of the knife blade was consistent with Stroude's version of events. Knox opined that, although the crime scene and blood pattern evidence did not confirm Luster's statement about the incident as compared to Stroude's, that evidence was not inconsistent with his version of the incident.

The defense advised the court that, pursuant to advice of counsel with which Luster agreed, he would not testify. The judge confirmed that decision with Luster.

In rebuttal, the State recalled Keith Holt, who testified that Michael Abate passed by in the hall when Holt was in the doorway of Stroude's apartment. Holt said he asked Abate to go let the EMT's in and that Abate never entered the apartment or got close to Luster or Stroude. Holt did not recall Luster saying

anything to Stroude when he approached her as she sat in the chair waiting for the EMS personnel.

Lisa Flannagan, M.D., a forensic pathologist, testified that, after reviewing the police report, photographs of the scene and of the two individuals involved, medical records, and other documents and statements, in her opinion Stroude's three stab wounds to her back were inflicted by someone else and that stab wounds to her torso could have been life threatening. She said that blood would not likely have spurted from the chest wounds, but could have been thrown up on the wall when the knife was pulled out forcefully during the attack.

Dr. Flannagan testified that Luster's chest wounds were relatively aligned and could have been self-inflicted. She explained that the wounds were all on a surface of the body that was readily accessible and it appeared there was not a lot of movement between the individual stabs. The wounds were generally the same size. Dr. Flannagan opined that if the cuts to Luster's fingers transected his tendons, he could not have gripped anything, and the cuts would have occurred after Stroude's injuries. She opined that the wound on Stroude's finger could be classified as a defensive wound.

During Dr. Flannagan's testimony, the State was allowed to introduce portions of the video of Luster's testimony at the first trial over defense objections. Defense counsel stated, "We don't have an objection to the transcript being

introduced into evidence, or even being—we can identify the transcript, the redacted copy of the transcript as a previous proceeding." (Doc. 4-5 at 954). Counsel also said the video would feature Luster testifying at a previous trial, which would be prejudicial since he is not testifying in this trial. The court determined that the relevance outweighed any prejudice. Defense counsel then stated, "I have no problem playing it, without showing that he's testifying at a trial. And we can stipulate that it's from a previous proceeding. They can make whatever assumptions that they want to make about it." (Doc. 4-5 at 957-58).

The video was played in which Luster testified that he was sipping water when he felt rapid thrusting and saw Stroude stabbing him in the chest. He said he threw his hands up to try to stop her and tried to grab the knife, but she ripped it out of his hand and came back at him with the knife, which he said he grabbed with the other hand and that she ripped it out of his hand again. He testified he was able to use his forearms and wrist area to wrestle her arm behind her back and then wrestle her to the floor, but they both hit the wall first. He said when they hit the floor hard, she let out a loud scream because, he thought, that was when the knife got into her back. He said he was straddling her and hitting at her with his hands. He testified that after the roommate came in, he got up and leaned his hands on the bed, but that Stroude had the knife blade gripped in some sweatpants and came at him again, but paused and appeared to hear something. He said he leaned against the closet door. The video

was paused and then resumed with his cross-examination testimony explaining that he wrestled Stroude to the floor with his forearms or wrists.

Dr. Flannagan resumed her testimony to say that nothing in the video changed her opinion that Stroude could not have gotten the stab wounds on her back from rolling around on a knife. She testified that if the knife were in Stroude's hand behind her back and had somehow been pointing up, the knife would not have stabbed her in the upper back. The defense moved for a mistrial due to prejudice from playing the prior testimony, arguing that he did not testify in this trial, as he did in the first trial, because similar fact evidence was not admitted in this trial. The motion was denied, with the court noting that this specific objection was not made to the video before it was played. Without waiving objection to the video being shown, the defense asked that the jury be instructed that this trial is a retrial.

On cross-examination, Dr. Flannagan testified that she did not think it likely that Stroude was stabbed in the chest during Luster's attempts to get the knife away from her. She did not see how the knife could have penetrated Stroude's back three times once they fell to the floor. She testified that the blood drops that had run down on the lower part of the closet door, as appeared in the photographs taken on the day of the incident, were not consistent with Luster's statement that he leaned on the door and transferred blood to it. She again testified that she believed his chest injuries were self-inflicted. She opined that the injuries to his fingers and hands likely

occurred after the knife was broken and he was trying to stab himself with the blade, first with one hand and then with the other. Dr. Flannagan agreed it was also possible that his fingers were cut if he grabbed the knife from Stroude. The hand injuries could also have occurred if he was holding the blade and trying to stab with it. She agreed his wounds could also be described as defensive wounds.

The defense objected to inclusion of a jury instruction on aggravated battery as requested by the State and to instruction on "any other lesser" offense (Doc. 4-5 at 1045), but otherwise agreed to the jury instructions. The jury instructions included the instruction on self-defense and justifiable use of deadly force, but did not include an instruction that explained the circumstances under which a person using deadly force has no duty to retreat and may stand their ground.

The jury returned a verdict finding Luster guilty of the lesser included offense of attempted second-degree murder and that during the offense, Luster personally used or threatened to use a weapon. (Doc. 4-5 at 1-1145). Luster was sentenced to 20 years of imprisonment. (Doc. 4-1 at 74-82).

## B.   Post-Trial Proceedings

Luster appealed to the Florida First District Court of Appeal ("First DCA"), which affirmed per curiam without discussion on March 22, 2016, and denied rehearing on May 12, 2016. (Doc. 19-1 at 1, 13). *See Luster v. State*, 190 So. 3d 637 (Fla. 1st DCA 2016) (Table). Luster's motion to reduce sentence filed under Florida

Rule of Criminal Procedure 3.800(c) was denied on September 12, 2016. (Doc. 3-2 at 100).

Luster filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850 on June 19, 2017. (Doc. 3-2 at 104). He raised four issues alleging ineffective assistance of counsel for: (1) advising him not to testify based on a mistaken belief that the video from the first trial would not be admitted; (2) failing to request a jury instruction on attempted manslaughter; (3) failing to request a jury instruction on a "Stand Your Ground" defense; and (4) cumulative error. An evidentiary hearing was held on the claims on November 8, 2017. (Doc. 3-7 at 162-269). At the conclusion of the hearing, the trial judge denied the motion, stating the reasons for the denial on the record.[4] (Doc 3-7 at 260-67). A written order denying postconviction relief was entered on that same date. (Doc. 3-7 at 155). Luster appealed the denial of postconviction relief to the First DCA, which affirmed per curiam on July 22, 2019, and issued the mandate on September 18, 2019. (Doc. 19-2 at 1, 9). *See Luster v. State*, 278 So. 3d 23 (Fla. 1st DCA 2019) (Table).

Luster filed his counseled federal habeas petition on October 31, 2019. (Doc. 1). His amended petition, filed on December 12, 2019, raises three claims asserting ineffective assistance of trial counsel. (Doc. 10).

---

[4] The details of the testimony at the evidentiary hearing and the court's rulings will be discussed *infra* in relation to the specific grounds raised in the § 2254 petition.

## II. Relevant Legal Principles

### A.      Section 2254 Standard of Review

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 367 (2000).[5] Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.* at 412-13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or

---

[5] Unless otherwise noted, references to Supreme Court's *Williams* case are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion, 529 U.S. at 367-75, 390-99, and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II, 529 U.S. at 403-13. The opinion of Justice Stevens in part II was joined by Justices Souter, Ginsburg, and Breyer.

principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law. The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases – indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court. *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State

court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application" clause, the federal court applies an objective test. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding."). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Schriro*, 550 U.S. at 473-74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has often emphasized that a state prisoner's burden under § 2254(d) is "difficult to meet . . . because it was meant to be." *Harrington*, 562 U.S. at 102. The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333, 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata

rule" under § 2244). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, <u>a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement</u>.

*Harrington*, 562 U.S. at 102-03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

## B.   Federal Law Governing Claims of Ineffective Assistance of Counsel

The Supreme Court follows a two-pronged test for evaluating claims of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). The petitioner must show (1) his counsel's performance was constitutionally deficient, and (2) the deficient performance prejudiced him. *Id.* at 687. "First, petitioner must show that 'counsel's representation fell below an objective standard of reasonableness.' Second, petitioner must show that 'there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (quoting *Strickland*, 466 U.S. at 694).

The inquiry under *Strickland*'s performance prong is "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. Trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. The burden to overcome that presumption and show that counsel's performance was deficient "rests squarely on the defendant." *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) ("To overcome that presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances." (quotation marks and alterations omitted)); *see also Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) ("[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take.").

*Strickland*'s prejudice prong requires a defendant to establish a "reasonable probability" of a different trial outcome. *See Strickland*, 466 U.S. at 694. A reasonable probability is one that sufficiently undermines confidence in the outcome. *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *See Strickland*, 466 U.S. at 698. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105 (citations omitted). The Supreme Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* (citations omitted).

## III. DISCUSSION

**Ground One**  **Defense counsel rendered ineffective assistance in advising Luster not to testify based on their mistaken belief that his testimony from the first trial would be inadmissible if he did not testify. (Doc. 10 at 9).**

Luster contends that his trial counsel rendered ineffective assistance in advising him not to testify in his second trial based on their mistaken belief, and assurance to him, that testimony from his first trial would not be admissible. (Doc. 10 at 9). After the defense rested, the State was permitted over objection to play a video of portions of Luster's testimony in the first trial during the rebuttal testimony of Dr. Flannagan as a basis on which to elicit certain opinion testimony from her. Luster contends that counsels' advice not to testify was deficient because there is a reasonable probability that had he testified—as he did in the first trial that ended in a hung jury—the result of the second trial would have been different.

### A. State Court's Decision

Luster raised this claim in his Rule 3.850 motion in state court and was provided an evidentiary hearing. His lead trial counsel testified at the hearing that it was her belief that Luster should not testify at trial, but that she decided to wait until mid-trial to make a decision on that issue. She explained that if enough evidence supporting self-defense came out at trial, she and co-counsel would recommend he not testify. (Doc. 3-7 at 168-69). She presented three experts to support Luster's self-defense theory and, at the close of the defense's case, discussed the decision with

Luster. She said that when she rested her case, it was her belief that the State would not be able to admit Luster's prior trial testimony and she was surprised when they did so. (Doc. 3-7 at 171-72). Counsel objected to presentation of the video, and after the video was presented, the defense team moved for mistrial, which was denied.

Counsel testified that there were multiple conversations with Luster about the decision whether to testify, and that both she and her co-counsel ultimately agreed he should not testify. (Doc. 3-7 at 180). Counsel said that the belief that the video from the first trial would not be admitted was not the only reason counsel recommended Luster not testify. She said she was concerned that if he testified, it might be inconsistent with his earlier testimony, which would have allowed his earlier testimony to be used for impeachment. (Doc. 3-7 at 185-86). Counsel explained that there also was evidence that Luster could be confronted with which was not introduced at the first trial, including a message to his father shortly after the incident. (Doc. 3-7 at 186-87).

Counsel testified that it was a strategic decision to elicit evidence of self-defense through other testimony. She could not provide any examples of testimony that Luster could have given to support his self-defense theory that did not come out through the other means used by counsel. (Doc. 3-7 at 188). Counsel testified that even if she had known the video of a portion of Luster's testimony from the first trial could be admitted if he did not testify, she still would have advised him not to testify.

(Doc. 3-7 at 189, 199). It wasn't that counsel did not want the jury to hear his prior testimony, it was that counsel did not want the jury to hear his current testimony and be cross-examined about things that the prosecutor had not found prior to the first trial. (Doc. 3-7 at 204).

Defense co-counsel testified that he thought testimony from the first trial would come in only for impeachment if Luster testified or if it was used as the basis for an expert opinion. (Doc. 3-7 at 209). Co-counsel confirmed that the belief that prior testimony would not be admitted was not the only reason Luster was advised not to testify. Co-counsel did not want Luster to face cross-examination if it could be avoided. (Doc. 3-7 at 214). Co-counsel felt Luster's testimony was not necessary to establish self-defense, and his version of events could be elicited through the experts. (Doc. 3-7 at 215-16). Co-counsel agreed that the portion of Luster's prior testimony played for the jury was a complete explanation of his version of how the injuries occurred. (Doc. 3-7 at 217).

The postconviction court denied the claim, finding that both defense counsel were mistaken about the circumstances under which the prior testimony could be admitted and provided misadvice to Luster on that mistaken belief, thus constituting deficient performance. (Doc. 3-7 at 260). However, the state court concluded that the second prong of *Strickland*—prejudice—had not been shown because both counsel gave reasonable explanations of why they would have given the same advice

not to testify even if they had not misunderstood the law. The court noted that it appeared Luster was prepared to follow his counsels' advice and had no strong opinion about testifying, and that the trial judge confirmed Luster's desire not to testify. The court reasoned that if Luster had testified, he would have either confirmed his prior testimony or been impeached for giving different testimony, and the court could not see how anything would have changed. Finding no prejudice, the claim was denied. (Doc. 3-7 at 260-62). The denial of relief was affirmed on appeal without discussion. *Luster v. State*, 278 So. 3d 23 (Fla. 1st DCA 2019) (Table).

### B.   Luster's Claim Does Not Warrant Habeas Relief

Despite the state court finding that counsel misadvised Luster based on a misapprehension of the law,[6] the State contends that deficient performance is not automatically proven and that counsels' advice that Luster not testify also was based on other valid strategic concerns. (Doc. 19 at 43-44). The State cites the judge's finding that counsels' advice did not depend solely on their belief that the State could not play the video, and that other factors weighed heavily regarding impeachment if

---

[6] A defendant's testimony at a prior trial generally is admissible against him in subsequent proceedings. *See* Fla. Stat. § 90.803(18) (2014); *Barnes v. State*, 970 So. 2d 332, 335 (Fla. 2007); *see also Harrison v. United States*, 392 U.S. 219, 222 (1968).

his testimony were to differ from that in the first trial and regarding matters not known during the first trial.

Even assuming, as the postconviction court found, that counsel performed deficiently in advising Luster not to testify based in part on misapprehension of the law, Luster has not shown that the State court's finding—that no prejudice was demonstrated—was objectively unreasonable. Luster has not demonstrated a reasonable probability—one measured in terms of undermining confidence in the outcome—that but for counsels' error, the result of the trial would have been different as required by *Strickland*.

As both defense attorneys testified at the evidentiary hearing, they were aware of damaging impeachment that would likely come into the second trial if Luster testified. By presentation of the video, his self-defense version of the incident was presented without him being subjected to cross-examination and possible impeachment. Luster's video testimony from the first trial was consistent with the self-defense case presented by way of his experts and by way of cross-examination of the State's witnesses. If Luster had testified at the second trial, any differences between that and the testimony from the first trial could have undermined the rest of his defense case and could have subjected him to damaging impeachment. Further, Luster did not indicate what evidence he would have given if he testified that was

different and more helpful to his defense than the version of events that he gave at the first trial and which the jury heard in the video testimony.

Luster's assertion that if only he had testified, his trial would have resulted in a finding of not guilty or guilty of a lesser offense is speculation. The jury heard testimony setting forth both versions of events and chose to believe Stroude and the State's witnesses. The evidence presented was sufficient to sustain Luster's conviction for attempted second-degree murder. The evidence elicited both in the State's case and in cross-examination of the defense witnesses cast doubt on Luster's version in several respects, including his ability to have handled the knife defensively resulting in Stroude's stab wounds, if his hands were severely cut before her wounds were inflicted.

Luster has not shown that no fairminded jurist could have concluded, as the Florida courts did, that he failed to carry his burden of showing that his counsel performed ineffectively by advising him not to testify, and that if he had testified, there is a reasonable probability of a different outcome at trial. Luster has not shown that the evidence on the prejudice question is so one-sided in his favor that the answer is, as the Supreme Court has phrased it, "beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. He has not shown that the Florida courts' determination of the ineffective assistance of counsel issue was so unjustified that it "was an error well understood and comprehended in existing law

beyond any possibility for fairminded disagreement." *Id.*; *see also Holsey v. Warden, Ga. Diagnostic Prison,* 694 F.3d 1230, 1258 (11th Cir. 2012). Therefore, Luster is not entitled to federal habeas relief on this claim.

**Ground Two**        **Defense counsel rendered ineffective assistance by failing to request the jury be instructed on attempted voluntary manslaughter. (Doc. 10 at 15).**

In this ground, Luster contends that defense counsel rendered ineffective assistance by failing to request a jury instruction on the lesser included offense of attempted voluntary manslaughter. He argues that counsel intended to ask for that instruction and did not realize it was not contained in the jury instructions. (Doc. 10 at 15). He contends that there is no evidence to support the state court's finding that counsel intended to omit the attempted manslaughter instruction. He also argues that if the instruction had been given, there is a reasonable probability that the result of the trial would have been different.

**A.    State Court's Decision**

Luster raised this claim in his Rule 3.850 motion in state court, arguing that counsel thought they had requested a jury instruction on attempted manslaughter and failed to object when that instruction was not given. (Doc. 3-2 at 111-12). He argued that if the error had been preserved, it could have been raised on direct appeal as

reversible error, not fundamental error as it was raised.[7] He also contended that the court could not be confident that if the instruction had been given, the jury would not have returned a verdict for that lesser offense. (Doc. 3-2 at 112).

Luster was provided an evidentiary hearing on this claim. His lead defense counsel testified that she initially requested that no lesser-offense instructions be given because that is what Luster and his father wanted. She said he wanted "all or nothing," meaning instruction on attempted first-degree murder only. (Doc. 3-7 at 174, 190-92). She testified that at the charge conference she realized that the category-one lesser offense of aggravated battery would be instructed and would be on the verdict form. She testified that she then believed that attempted manslaughter, also a lesser included offense of attempted first-degree murder, would be instructed and be on the verdict form. She recalled a draft version of proposed jury instructions containing that lesser offense. (Doc. 3-7 at 175). She did not recall exactly when, but after the trial she realized that attempted manslaughter had not been instructed or on the verdict form and a motion for new trial was filed raising that ground. (Doc. 3-7 at 175-76). When questioned later by the court, counsel testified that she would have

---

[7] To the extent that a possible favorable result on appeal was argued as a basis for prejudice, the argument is misplaced. *See Torres v. Sec'y, Dep't of Corr.*, 843 F. App'x 203, 209 n.5 (11th Cir. 2021) ("The Supreme Court in *Strickland* told us that when the claimed error of counsel occurred at the guilt stage of a trial (instead of on appeal) we are to gauge prejudice against the outcome of the trial: whether there is a reasonable probability of a different result at trial, not on appeal.") (quoting *Purvis v. Crosby*, 451 F.3d 734, 739 (11th Cir. 2006)).

preferred that all applicable lesser-included offenses be instructed and included on the verdict form and was positive she so advised Luster, but "they were adamant they didn't want lessers." (Doc. 3-7 at 205).

Defense co-counsel testified that he assumed all lesser offenses would be given and when the instructions were being read to the jury, he realized attempted manslaughter was not included, but did not object. (Doc. 3-7 at 211). He agreed that when he realized attempted manslaughter was not included, he was okay with that because it was in accord with the original strategy. He also agreed that his strategy in the case was to object to all lesser offenses and that Luster never wavered in his desire that no lesser be given. (Doc. 3-7 at 217-18). Co-counsel thought that attempted manslaughter not being on the verdict form was to Luster's advantage. (Doc. 3-7 at 223). He testified that if Luster had wanted lesser included offenses on the verdict, counsel would have requested them. (Doc. 3-7 at 225). Luster testified at the hearing that once aggravated battery was included on the verdict, he "wanted all the lesser includeds." (Doc. 3-7 at 227-28)

The postconviction court denied the claim, concluding that it was not deficient performance for counsel to follow Luster's wishes. (Doc 3-7 at 263). The judge did not accept the argument that inclusion of aggravated battery as a lesser offense changed that circumstance. "Mr. Luster was adamant" that he wanted no lessers. (Doc. 3-7 at 264). The court found that the attorneys' description of not

understanding that attempted manslaughter was not in the instructions "was belied by the record." (Doc. 3-7 at 264). The court also found that it was not clear how counsel did *not* know that attempted manslaughter had been deleted from the instructions at their request based on Luster's desire for no lesser included offenses. (Doc. 3-7 at 265).

The postconviction court also concluded that even if counsel were deficient in not insisting that attempted manslaughter be included, Luster did not demonstrate prejudice. The court found no reasonable probability that the jury would have skipped over aggravated battery on the verdict form to find Luster guilty of attempted manslaughter. (Doc. 3-7 at 265-66).

### B.   Luster's Claim Does Not Warrant Habeas Relief

Luster has not demonstrated that the adjudication of the state court denying his claim of ineffective assistance on this issue is objectively unreasonable. When Luster filed his direct appeal, he argued fundamental error in failing to include a jury instruction on attempted manslaughter, but the appellate court affirmed the conviction and sentence without explanation. It is not unreasonable to conclude that the denial was based on the record, as argued by the State in its answer brief (Doc.

3- at 58-59), showing that Luster did not want any lesser included offenses on the verdict form.

In his postconviction motion, Luster asserted that counsel were ineffective in failing to have the court instruct the jury on attempted manslaughter. The postconviction court found no deficiency because the evidence showed Luster was adamant in not wanting lesser included offenses on the verdict form. The court also found no prejudice was shown because the jury was provided with the choice of aggravated battery, expressly described to the jury by the court as a lesser offense, and convicted Luster of the greater offense of attempted second-degree murder anyway. The court stated,

> I just can't find any reason to believe the jury would have for some reason or other gone two steps down from where they ended up. It came back. They had a first degree, second degree, aggravated battery. The defense thinks they should have had the attempted manslaughter added in. I can't think of any reasonable reason why the jury would have gone all the way from attempted second degree and skipped over aggravated battery. That really doesn't make much sense. I don't think there's any reasonable probability of that.[8]

---

[8] The court appears to be referring to the potential listing of the offenses on the verdict form and assuming that attempted manslaughter would have been listed after both attempted second-degree murder and aggravated battery. This assumption is not incorrect based on the relative felony levels of the offenses. Aggravated battery is a second-degree felony, while attempted manslaughter is a third-degree felony unless reclassified. *See Richards v. State*, 128 So. 3d 959, 963 & n.4 (Fla. 4th DCA 2013) (citing *Sanders v. State*, 944 So. 2d 203, 207 (Fla. 2006) ("The charged crime should be followed on the verdict form by the determined lesser included offenses in descending order by degree of offense."). As Luster notes in his reply, on April 24, 2014, the Florida Supreme Court issued a revised jury instruction for lesser offenses applicable to attempted first-degree murder. *In re Standard Jury*

(Doc. 3-7 at 265-66).

The appellate court affirmed, without explanation, the denial of Luster's postconviction claim that counsel rendered ineffective assistance by failing to assure that attempted manslaughter was included as a lesser offense on the verdict form and in the instructions. The First DCA's summary affirmance is an "adjudication on the merits" entitled to deference under 28 U.S.C. § 2254(d). *See Harrington*, 562 U.S. at 99, 100. Consistent with *Wilson v. Sellers*, 584 U.S. __, 138 S. Ct. 1188 (2018), this court "look[s] through" the First DCA's unexplained decision to the circuit court's order denying postconviction relief and presumes that the First DCA adopted the same reasoning. *Wilson*, 138 S. Ct. at 1192.

In his postconviction appeal of this claim, the State argued in its answer brief that deficient performance was not shown because, as the postconviction court found, the lawyers did not request any lesser offenses because Luster did not want any. (Doc. 3-1 at 49). The State also noted the postconviction court's explanation

---

*Instructions in Crim. Cases—Rep. No. 2013-02*, 137 So. 3d 995, 1002 (Fla. 2014). The instruction listed attempted second-degree murder and manslaughter by act as category one lesser included offenses and aggravated battery as a category two lesser offense. Luster's trial was held July 15, 2014. It is unproductive to speculate as to whether the offenses would have been listed in the order described in *Richards* or in the order appearing in the newly adopted jury instruction—and whether it would have made any difference—because Luster did not want any lesser instructions given and because the jury rejected a lesser included offense and found, instead, that the evidence proved attempted second-degree murder.

that an initial draft of jury instructions prepared by the court would include all the possible instructions, subject to counsel requesting deletion of those not applicable. The First DCA was apprised of the portions of the record that reflected the final instructions were provided to counsel and their only objection was to the aggravated battery instruction sought by the State. (Doc. 3-1 at 85-86).

The trial record reflects that the trial judge was informed that Luster did not want lesser included offenses on the verdict form. When the State sought to have aggravated battery on the verdict form, counsel objected, stating that counsel spoke with Luster who said he did not want the lesser offense. (Doc. 4-5 at 914-15). When the State again requested that aggravated battery be included on the verdict, defense counsel again objected, "We would object to an aggravated battery or any other lesser." (Doc. 4-5 at 1045). Shortly thereafter, the court gave a copy of the revised jury instructions to all counsel and the verdict form was discussed. The court expressly stated that the jury instructions were changed by the addition of aggravated battery as a lesser offense. Counsel agreed the instructions were acceptable "subject to our objection to the aggravated battery." (Doc. 4-5 at 1047-49).

At the postconviction evidentiary hearing, counsel confirmed that Luster and his father, who was involved in the defense, wanted no lesser included offenses. (Doc. 3-7 at 174). Counsel testified that Luster's position was "[t]he same position as the first trial, that they didn't want any." She said, "And they were actually pretty

adamant about not wanting any. By they, I mean the client and his father." (Doc. 3-7 at 190). She explained, "They didn't want any lesser. That if you couldn't prove attempted first degree murder or premeditation, you know, there would be nothing else. . . . They just didn't want any period." (Doc. 3-7 at 192).

Defense co-counsel testified at the evidentiary hearing, without elaboration, that it was his understanding that all the lesser included offenses would be in the jury instructions. (Doc. 3-7 at 210). He said he realized attempted manslaughter was not in the instructions when they were read but did not object because that was in accord with the original strategy not to include lessers. (Doc. 3-7 at 211, 218). He agreed that even with the aggravated battery instruction being given, Luster did not want them instructed on attempted manslaughter. (Doc. 3-7 at 222). He also testified, "And with the manslaughter not being there, I thought it was to his advantage for it not to be there." (Doc. 3-7 at 223). Co-counsel further testified, "In a situation where the client is saying I don't want any lesser, you know, they got to come with that they're (sic) charged me with or nothing at all, then I didn't feel the need to go against what they wanted and make that argument." (Doc. 3-7 at 224). He agreed that if Luster had wanted attempted manslaughter as a lesser offense on the verdict, counsel would have made sure it was there. (Doc. 3-7 at 225). Only after Luster was convicted of attempted second-degree murder did counsel pursue a claim that the

lesser offense of attempted manslaughter should have been provided to the jury as an option.

The postconviction court did not accept as credible counsel's testimony that they had reason to believe the jury instructions included attempted manslaughter and that the defense position changed regarding lesser offenses on the verdict form and in the instructions. This finding is supported by the trial record and the testimony at the evidentiary hearing. It was not objectively unreasonable for the First DCA to have concluded, as did the postconviction court, that failure to include the attempted manslaughter instruction was the result of Luster's adamant desire not to have lesser included offenses on the verdict form.

It also was not objectively unreasonable for the First DCA to conclude, as did the postconviction court, that prejudice was not demonstrated by speculation that the jury might have rejected one lesser offense to convict him of a different lesser offense, even though the evidence supported the higher offense of attempted second-degree murder. The jury in this case concluded that the evidence supported the offense of attempted second-degree murder. Luster posits, as a basis to find prejudice, that if another lesser offense had been on the verdict form, in addition to the lesser offense of aggravated battery not chosen by the jury, that the jury would probably have found him guilty of attempted manslaughter. Such an argument relies on the concept that a jury would ignore its findings of evidence on the higher charge

in order to provide the equivalent of a jury pardon. However, the loss of a possible

jury pardon due to counsel's failure to seek instruction on a lesser offense is not a

basis on which to find *Strickland* prejudice. *See Crapser v. Sec'y, Dep't of Corr.*,

855 F. App'x 626, 628 (11th Cir. 2021). The Eleventh Circuit explained:

> The jury concluded that the evidence against [the defendant] supported
> his conviction for the molestation offense on which it was instructed.
> Therefore, even if the lesser-offense instructions had been given, the
> jury would not have been permitted to convict Crapser of the lesser-
> included offenses because it had concluded that the evidence
> established that he was guilty of the greater offenses.

*Id.* (citing *Sanders v. State*, 946 So. 2d 953, 958 (Fla. 2006)). The court in *Crapser*

further explained:

> In evaluating prejudice, according to *Strickland*, "a court should
> presume, absent challenge to the judgment on grounds of evidentiary
> insufficiency, that the judge or jury acted according to law. An
> assessment of the likelihood of a result more favorable to the defendant
> must exclude the possibility of arbitrariness, whimsy, caprice,
> 'nullification,' and the like." *Id.* In other words, "[a] defendant has no
> entitlement to the luck of a lawless decisionmaker." *Id.* at 695, 104 S.
> Ct. 2052.

855 F. App'x at 628; *see also Santiago v. Sec'y, Fla. Dep't of Corr.*, 472 F. App'x

888, 889 (11th Cir. 2012) (holding that the state court did not unreasonably apply

*Strickland* when it rejected an ineffective assistance claim arising from counsel's

failure to request lesser included offense instruction because the jury concluded the

evidence against him supported the greater offense and would not have been

permitted to convict the defendant of the lesser offense); *Davis v. Sec'y, Fla. Dep't*

*of Corr.*, No. 21-11463-J, 2021 WL 5045241, at \*1 (11th Cir. Sept. 1, 2021) (same). Although nothing prohibits a jury from convicting on a lesser offense if given the option to do so, that is not enough to show that the state court's decision was an unreasonable application of *Strickland*. *Crapser*, 855 F. App'x at 629.

In light of the record, and in light of the credibility determinations made by the postconviction court after an evidentiary hearing, Luster has not demonstrated that the state court's adjudication is contrary to or an unreasonable application of any clearly established federal law as determined by the United States Supreme Court, or was an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Habeas relief on Ground Two should be denied.

**Ground Three**      **Defense counsel rendered ineffective assistance by failing to assure the jury was properly instructed on the "Stand Your Ground" defense. (Doc. 10 at 24).**

Luster contends that trial counsel should have made sure that the jury was instructed that if he was in a place he had a right to be, he had no duty to retreat and could stand his ground. He further contends that this alleged error, when combined with the alleged errors in Grounds One and Two, cumulatively denied him a fair trial. (Doc. 10 at 27-28).

## A.    State Court's Decision

Luster raised this issue in his Rule 3.850 motion and was provided an evidentiary hearing. At the hearing, defense counsel explained that prior to trial, the defense filed a "Stand Your Ground" motion seeking immunity from prosecution in which counsel argued that Luster had no duty to retreat under the facts of the case. (Doc. 3-7 at 177; Doc. 4-1 at 29). Ruling on the motion was reserved until after trial at which time it was denied. (Doc. 3-7 at 196; Doc. 4-1 at 40). Counsel testified that after trial, she realized that the jury was never instructed on Luster's right to stand his ground and not retreat if he reasonably believed deadly force was necessary to prevent his death or great bodily harm. She said she did not know why that instruction was not included in the instructions given to the jury. (Doc. 3-7 at 177). She confirmed that she did not ask for a "Stand Your Ground" instruction, but agreed that such an instruction was not critical to her defense that Luster acted in self-defense. She also agreed that duty to retreat was not an issue in the case. (Doc. 3-7 at 192-94).

Co-counsel testified that he became aware that the "Stand Your Ground" instruction was not given when the Rule 3.850 motion was being prepared. He said it was counsels' mistake not to have requested the instruction. (Doc. 3-7 at 212). He conceded, however, that the instruction on no duty to retreat would not have assisted in developing the defense theory in the case—because the defense asserted Luster

was ambushed by Stroude and would have had no opportunity to retreat and because the issue did not come up in closing. (Doc. 3-7 at 219).

The postconviction court denied the claim, concluding that the instruction was not relevant to the defense theory of "ambush" and self-defense that Luster pursued. The court found there was no reason for counsel to request it on the facts and, thus, counsels' performance was not deficient. The court also concluded that no prejudice had been demonstrated because the substance of the "Stand Your Ground" instruction "did not enter into the decision[-]making in any way." (Doc. 3-7 at 266-67). The First DCA affirmed denial of the claim without explanation. *Luster v. State*, 278 So. 3d 23 (Fla. 1st DCA 2019) (Table).

## B.   Luster's Claim Does Not Warrant Habeas Relief

Luster contends that the jury should have been instructed on a "Stand Your Ground" defense indicating that he had no duty to retreat, as the Florida standard jury instruction states in pertinent part:

> If (defendant) was not otherwise engaged in criminal activity and was in a place [he] [she] had a right to be, then [he] [she] had no duty to retreat and had the right to stand [his] [her] ground.

Excerpt, Fla. Std. Jury Instr. (Crim.) 3.6(f), Justifiable Use of Deadly Force. The self-defense instruction that was given in Luster's case stated in pertinent part:

> The attempted killing of a human being is justifiable and lawful if necessarily done while resisting an attempt to murder or commit a felony upon the defendant or to commit a felony in any dwelling house in which the defendant was at the time of the attempted killing.

Page 40 of 46

. . . .

An issue in this case is whether the defendant acted in self-defense. It is a defense to the offense with which Reginald Luster is charged if the injury to Gabriella Stroude resulted from the justifiable use of deadly force.

"Deadly force" means force likely to cause death or great bodily harm. A person is justified in using deadly force if he reasonably believes that such force is necessary to -- that should be "prevent" instead of "present", so if you'll correct that -- prevent imminent death or great bodily harm to himself or to prevent the imminent commission of murder against himself.

In deciding whether the defendant was justified in the use of deadly force, you must judge him by the circumstances by which he was surrounded at the time the force was used. The danger facing the defendant need not have been actual. However, to justify the use of deadly force, the appearance of danger must have been so real that a reasonably cautious and prudent person, under the same circumstances, would have believed that the danger could be avoided only through the use of that force.

Based upon appearances, the defendant must have actually believed that the danger was real. In considering the issue of self-defense, you may take into account the relative physical abilities and capacities of the defendant and Gabriella Stroude. If, in your consideration of the issue of self-defense, you have a reasonable doubt on the question of whether the defendant was justified in the use of deadly force, you should find the defendant not guilty. However, if from the evidence you are convinced that defendant was not justified in the use of deadly force, you should find him guilty if all the elements of the charge have been proved.

(Doc. 4-5 at 1054, 1058-60). This language was taken from Florida Standard Jury

Instruction 3.6(f) on the question of justifiable use of deadly force.

As the postconviction court found, even if a "no duty to retreat" instruction

had been requested by the defense, it is "an open question whether they were even

legally entitled to it" because it was totally inconsistent with the "ambush" theory of defense. (Doc. 3-7 at 266). The instruction that was given by the trial court fully instructed the jury on legal principles applicable to Luster's self-defense theory and in no way impaired the jury's ability to find him not guilty if they believed his version of the events. Nothing in the instructions given to the jury suggests that Luster had any duty to retreat. Nothing argued by the State in closing suggested Luster had no right to be in Stroude's room or that he had a duty to retreat. Luster's theory of defense did not hinge on the jury finding he had no duty to retreat and could stand his ground.

Instruction on "duty to retreat" may properly be excluded from the instructions where the evidence presented did not support inclusion of it; and where the jury was fully instructed on the defendant's self-defense theory, counsel is not deficient for failing to request the "Stand Your Ground" portion of the Justifiable Use of Force instruction. *See, e.g.*, *Rushing v. Sec'y, Fla. Dep't of Corr.*, No. 3:16-CV-112-J-32JBT, 2019 WL 1117042, at *11-12 (M.D. Fla. Mar. 11, 2019), *certificate of appealability denied*, No. 19-11383-E, 2019 WL 5107005 at *2 (11th Cir. Oct. 2, 2019). The district court in *Rushing* noted, "Foremost, the first sentence of Instruction 3.6(f) reads: '*Because there are many defenses applicable to self-defense, give only those parts of the instructions that are required by the evidence*.'" *Rushing*, 2019 WL 1117042, at *11 (italics and emphasis in original).

The state court adjudication that ineffective assistance has not been demonstrated is not objectively unreasonable in light of the evidence presented at trial and the issues present in the case. Luster's defense theory was self-defense upon the sudden stabbing attack by Stroude. Even though Stroude testified that she had asked Luster to leave the apartment after their argument, she did not testify that Luster had no right to be there, and the evidence supported the fact that she acquiesced to his presence when she sat down to read the note on his cell phone that he asked her to read. The State did not pursue prosecution based on the theory that Luster had no right to be in the apartment or that he had a duty to retreat. Both trial counsel testified at the evidentiary hearing that a "Stand Your Ground" instruction was not necessary for the self-defense case presented to the jury. And, as the postconviction court found, whether Luster had a right to be there and whether he had no duty to retreat were simply not issues in the case. For these reasons, regardless of alleged deficiency, no prejudice flowed from failure to instruct the jury that Luster had no duty to retreat.

The jury was fully instructed on Luster's right to defend himself with deadly force if he reasonably believed he was at risk of imminent death or great bodily harm from Stroude. The jury was instructed that if there was a reasonable doubt on the question of whether Luster was justified in the use of deadly force, the jury should find him not guilty. Based on the verdict, the jury did not find such reasonable doubt.

Luster has not demonstrated that the state court's adjudication of this claim was contrary to, or an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court or that it resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1), (2). Nor has he demonstrated any cumulative instances of deficient performance of counsel that denied him a fair trial.[9] Federal habeas relief on Ground Three should be denied.

## IV. CERTIFICATE OF APPEALABILITY IS NOT WARRANTED

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. *See* 28 U.S.C. § 2254 Rule 11(b).

"[Section] 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.' " *Miller-El*, 537

---

[9] The Eleventh Circuit has recognized that a cumulative-error claim may not be cognizable on federal habeas review. *See Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 & n.3 (11th Cir. 2012). Regardless, Luster has not shown multiple errors of counsel that cumulatively resulted in a constitutional violation or undermined the reliability of the jury's finding.

U.S. at 336 (quoting 28 U.S.C. § 2253(c)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.' " *Buck v. Davis*, 580 U.S. ___, 137 S. Ct. 759, 774 (2017) (quoting *Miller-El*, 537 U.S. at 327). Here, Petitioner has not made the requisite demonstration. Accordingly, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." 28 U.S.C. § 2254 Rule 11(a). If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

## V. CONCLUSION

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that:

1. The amended petition for writ of habeas corpus (Doc. 10), challenging the judgment of conviction and sentence in *State of Florida v. Reginal Luster*, Leon County Circuit Court Case No. 2012-CF-869A, be **DENIED**.

2. The District Court **DENY** a certificate of appealability.

3. The clerk of court close this case file.

At Pensacola, Florida, this <u>23rd</u> day of November, 2021.

<u>/s/ *Michael J. Frank*</u>
**Michael J. Frank**
**United States Magistrate Judge**

<u>**NOTICE TO THE PARTIES**</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**